PENDLETON, President,
delivered the resolution of the Court, as follows:
In these voluminous and complex cases, the Court have taken up the points discussed distinctly, and will occasionally state the papers and correspondence, applicable to each question, as they shall occur.
The transactions between the parties took rise from an agreement in November, 1783, between Mr. Alexander *85 and Jonathan Williams, by which they agree to bo jointly employed in supplying the Farmers General of France with tobacco, each to supply 100,000 livres for the purposes: Alexander to conic to, and settle in Virginia, in order to buy and ship the tobacco; and Williams to settle in France, to do the business there: Neither was to charge for his labor; but to be allowed all necessary expenses of housekeeping, travelling, clerks, &c. of which their respective books were to be evidence. Alexander was empowered to take in a partner in America; and, in March, 1784, assumed Mr. Morris as a partner, one-third concerned in the agreement; and all extension or alteration, which might take place, was to be by common consent; Morris to have a third of gain, and bear a third of loss, but to have no allowance for services, except actual expenses incurred.
Morris, thus introduced, made a new contract with he Normand, Receiver General of the finances of France, for the delivery of 60,000 hogsheads of tobacco, in the years 1785, 1786, 1787; for which he was to receive 36 livres per hundred, to be paid to the bankers Le Couteulx Sr Co. retaining two livres per centum to reimburse a million of livres, which was to be immediately advanced to Morris. Under these contracts, Mr. Alexander continued to purchase and ship tobacco until July, 1786. Tn the moan time, a loss having been sustained in the shipment of 3,000 hogsheads, from the high price in Virginia, he Normand permits Morris to ship 20,000 hogsheads more than the 60,000, within the limited time of three years; Morris to be at liberty to ship them, if convenient: he Normand bound to take them. July the 6th, 1786, Morris and Alexander enter into a new agreement, which reciting the contract with he Normand in January, 1785, and that Alexander had been employed to superintend the purchase and shipment of tobacco on terms to be after-wards settled, proceeds to settle the terms, as follows: All tobacco purchased by, or under the orders of Alexander, since October, 1784, till the completion of the contract with he Normand, were to be on the account and risk of Morris; and Alexander was to account for those, as well as for all gain on the sales of tobacco purchased, and commissions on purchases made for others: In consideration of. which, and as a recompense for his great abilities exerted, and to be exerted, Morris agrees to allow him, over and above all commissions to sub-agents and charges, a dollar/?*»• hogshead for every hogshead which had been, or *86 might be shipped to France, in consequence of the eontracts aforesaid; and to allow him two and a half^er cent. on all tobacco purchased and not sent to France. Alexander to retain all profit made by him, by speculations in military certificates, or otherwise.
Under this agreement, Mr. Alexander has credit for his dollar, on .60,000 hogsheads, although so many were not shipped before the end of the year 1787. But, his first claim discussed, is for % 20,000' for the tobacco which Mr. Morris was permitted to ship, if he chose, and did so within that year; the agreement between Morris and Alexander, is in terms confined to the contract for the 60.000 hogsheads, by reference to that contract for its date: and though both knew at the time that Morris had permission to add the 20,000 hogsheads, there is no reason to presume they meant to treat of it at all. Their silence, with that knowledge, is opposed to such presumption. It was optional with Morris; and it was precarious, whether it could be procured in time, in addition to the 60,000: Besides, it being substituted to recompense a loss in the 2.000 hogsheads borne by Morris, and producing a loss in itself, instead of a recompense, upon Mr. Alexander’s own principles, his claim is unfounded, as he would receive the reward for getting rid of a losing bargain, instead of yielding a beneficial interest. Although the agreement did not extend to the 2,000 hogsheads, yet the correspondence shews that Morris meant to allow the six shillings upon them, if they could be shipped in time to entitle him to the profit; and to such intention, the stimulus to exertion, “ increase my profit and your commission,” refers: It could not be purchased; Morris lost the profits; and Alexander’s demand of reward, for what he could not do, is unreasonable. Hints are given, as if both knew that the tobacco would be received in 1788; a fact not proved by any document, and contradicted by the event. Morris made an essay, in that year, to discover if it would be received: The discovery was unfortunate. Much labor was employed, in argument, to shew, on one side, that Morris did not supply funds sufficient, and, on the other, that Alexander misapplied the funds furnished to his private speculations. Neither is satisfactorily proved: For, although Alexander frequently recommends it to Morris to keep him supplied, he never states that he lost a single opportunity of purchasing, for want of them: The accounts shew, that there were always considerable ba *87 lances in the hands of him, and of his sub-agents; and though they consisted mostly in facilities, and not specie, those appear generally to have, answered the purpose: In the few instances where specie was required and sent for, it was furnished. The detention of the messengers, a few days, only proves that the difficulty of procuring, and Mor riffs anxiety to furnish, the specie. On the other band, the Court discover no proof of Alexander’s having used the funds for his private speculations. The true cause of disappointment appears, from Alexander’s letters, to have been at first, the high price of tobacco; and, after-wards, the scarcity of that commodity; of which, his strong expressions, that it could not be procured by the aid of the. best funds of Heaven and Earth, are the most conclusive evidence. Upon the whole, the Court is of opinion, that, this claim was properly rejected by the Court of Chancery.
The second claim is for about 1,700/. for household, or counting-house expenses. This is founded on the agreement between Alexander and Williams, wherein it is stipulated, that such expenses of house-keeping, 1 ravelling, clerks, &c., should be allowed, but which does not apply to the present contract. By the agreement between Alexander and Williams, as first entered into, both were to devote themselves to that business only; and to settle, one in Virginia, the other in France, for carrying it on: Neither was to charge any thing- for his labour, but their whole expense of living- was to be a common charge: When Morris was taken in, however, a different language is used; no mention of house-keeping, clerks, &c., is made; but, ho was to he allowed for actual expenses incurred. So, in the agreement between Morris and Alexander, charges are to be allowed over and above a large salary, and commissions to sub-agents.- Two auditors, who adjusted the accounts, well understood the common acceptation of charges, in a mercantile contract of this sort, to comprehend only real expenses paid in the purchase and shipment of tobacco; so much they had allowed in the costs of tobacco; and, therefore, they properly rejected the whole claim of 1,700/., including- those and other improper articles. On this point, therefore, the Court also approve the decree.
The third claim is for the loss of the tobacco, shipped in the Mary Anne, and the expenses on that occasion. The deposition of Eddins proves, that the loss was occasioned *88 either from the insufficiency of the ship or the bad conduct of the captain and seamen; and Mr. .Alexander must bear it, as owner of the former and answerable for the latter. On this point the decree is also approved.
We come then to the fourth, respecting Griffin’s certificate, from which Mr. Alexander insists to be discharged, on accounting for the price at which he sold them, amounting to 2,5711. 7s. 3d. which sale he justifies under his contract with Griffin in July, 1787, by which he was empowered to sell them for what they would fetch, to be applied to the purchase of the tobacco, as a security for which they were deposited.
The whole correspondence from March, 1786, to May, 1788, shews, that it. was Morris’s money which was advanced to Griffin; the securities his; and the delays in selling the certificates were by his consent: And why Alexander should complain of Morris’s having finally settled with Griffin, without consulting him, is not conceived, unless he meant to have added a heavy penalty upon Griffin, to his other gains of that .sort.
On the 3d of May, 1788, Morris wrote Alexander, that he had settled Griffin’s debt, and desired him to deliver Griffin all securities and deposits taken of him. John Richards and Alexander K. Marshall, _ prove Griffin’s demand and Alexander’s refusal; and the latter adds, that Alexander said he retained them as his property, and that Griffin said he should hold Alexander responsible for the certificates. Alexander’s letters to Morris of May 1st and 6th, state, that he retained the certificates as an indemnity against Morris’s protests; and for the same reason he refused to transfer vouchers for the out-standing debts, but said he was ready to do both, on having these protests produced, cancelled, or himself discharged. At that time the certificates were all in his hands, the sale of which he did not commence until the 16th of May; and we come to consider whether those sales were justifiable. That the certificates were the specific property of Morris, in the hands of Alexander, as his agent, is unquestionable; and, that an agent or factor may retain such property as security for a debt due, or as an indemnity against engagements for the principal, is also clear. But, whether he can sell such property, depends on the circumstances of each particular case, inducing a necessity for a sale to answer those purposes; and the circumstances ought to be strong, whereas, in the present case, the sale was forbid by the proprietor.
*89 The general principle laid down by Lord Majísitot,!), m Drinkwater et al. v. Goodwin, Cowp. 251, is, that a factor who receives cloths and is authorised to sell them, makes the buyer debtor to himself, and though he is not answerable for the debt, he has a right to receive the money. his receipt discharges the buyer, he may compel payment by suit, in which case the buyer could not defend himself by shewing that the principal was indebted to him; for, the principal can never say that, bid. where nothing is due to the factor. The circumstances there, were very strong; the factor’, when he became security, stipulated that the money borrowed should pass through his hands to the principal, a clothier, who was to send his cloth to sell, as usual, for his security: But, in the present case, the sale of these certificates was not within the ordinary agency of Alexander. They were deposited as a pledge for Morris’s money advanced, and subject to his control. He did not authorise, hut forbid the sale; and it can only bn justified, if at all, by shewing that money was then <tue to the agent, or that, a saie was necessary to exonerate him from his engagements for Morris. That Alexander was not a creditor at the time, but a debtor to upwards of 6,000/., appears from the account settled; and he must shew that his engagements required it, in order to justify the sale. The bills re,ally paid, are charged to Morris in the accounts settled, amongst which are Mr. Alexander John Alexanders; which, in his account, current March 28, 1788, he charges to Morris, with the interest and charges, amounting- to 2,1,91l. 3s. Id. currency: at the foot of that account, he states a list of bills returned and unsettled, amounting to 3,600/. sterling, a sum not equal to the balanco he owed, and would not justify a sale of the certificates, even if he had been pressed for payment, which is not shewn. Whether these, bills have been since paid by either party, or were endorsed by Alexander, does not appear, except that Morris says in his answer that Alexander has paid part of them, which is credited to him in the account settled. If they are yet out-standing, and were endorsed by Alexander, he ought to be indemnified by Morris against them. No other protests appear, except, those on which judgments have been recovered by Stott 8,‘ Donaldson; which judgments, Mr. Morris swears, in his answer to the last bill, he paid to those creditors in 3 793, and took an assignment of the judgments, on which he ought to give a release to Alexander,, which will amount *90 to an indemnity of the bail. There not appearing, then, any pressing necessity for a sale of the certificates on account of th.ose protests, Alexander had no power to sell; ought to be considered as having retained them, and to be made so accountable. For, though deposited with Gray and M’Nair, there seems to be no question but they are to be specifically delivered, on those defendants being indemnified as bail for Alexander, at the suit of Stott § Donaldson. As to the balance, Alexander is, by the decree, to procure and transfer stock of equal value, or compensate for their present value, to be settled by a jury. This is objected to, and it is urged, that the price they sold for, or the real value, at that time, ought to be the rule. After reasoning by analogy to the ease of trover on one side, and detinue on the other, which did not support the objection, since Morris had the option which of those suits he would commence, the counsel recurred to cases in this Court. Groves v. Graves, [1 Wash. 1,] was a contract to deliver, on a fixed day, certificates of a certain description, but no specific paper; and the principal reason for fixing the value at that day, was, that Groves was not afterwards obliged to take the paper if depreciated; and, therefore, ought not to-have the gain by their rise: But, this is not the case of property in specific paper, which remains at 'the risk of the proprietor, for gain or loss; and so it was determined in the cases of Reynolds v. Waller, [1 Wash. 164,] and Wilson v. Rucker, [1 Call, 500.] In both which, the value, at the time of the recovery, was the rule. * Of this responsibility Alexander was warned before the sale; and any hardship in the case, he has brought on himself by his own misconduct. On this point, therefore, the decree is also right; as is the dismission of the bill of Alexander John Alexander, as his protests were given up and charged to Morris before the sale, when Morris ceased tó be his debtor, and he became a creditor of William Alexander & Co. only.
We now come to the last point, whether Alexander shall be allowed to discount the notes of Morris S? Nicholson at their nominal value, or at the price which he paid for them? The latter is the decree, and that price to be settled by a jury. The question is important in value, but *91 she only difficulty is, to decide between two men, both of whom appear to have done wrong, on which of them the injury shall fall. On the one hand, it is impossible to jusfcii'y Morris, whether his conduct, proceeded from his distress, or an insatiable thirst for riches, in coining these millions of notes, to circulate under a promise to redeem them at full specie value, which he must have known he would not he able to do; and that the world would be thereby deceived. According to his account, however, mankind was nol wholly deceived; they got into circulation by his depositing them in heaps for money borrowed, and their value to him was what they would sell for. And those sales gave a tone to their depreciation from lime to time, as a rate at which they were generally passed between individuals. Of these deposits and sales, we have no account, till 1796, when some were deposited at two shillings in the pound, and which sold afterwards, in February, 1797, at twelve cents, something less than nine pence: at which rate Williams purchased at least 64,000 dollars of the notes now offered in discount; for, that they are the same notes, appears from a comparison of three lists, one by each of the brokers ,/hnridge, and Biddle, and the other by Alexander, all agreeing, so far as date, number and sums. The value Williams paid for them, appears in Biddle’s deposition. He received them in exchange for old notes, which were sold for less than the new ones, and he paid Biddle one cent per pound for (he difference.
Here, it may be necessary to observe, that the Court allow the depositions to be read, though taken after the decree and appeal, since they relate to the subject of discount; as to which the suits are to be considered as yet depending in the Court of Chancery, of which Morris ought not to be deprived, by the appeal having been granted before the iinal decree. The commissions were properly awarded, and the depositions taken in presence of the attorney of Alexander,
Having stated the situation of Morris, what is that of •Alexander? After suits depending near ten years, and the accounts between the parties are adjusted, he is found to be a fair debtor to Morris in a large sum; upon which he buys up those notes at about nine pence in the pound, and claims a discount for them at twenty shillings. Was lie deceived by the import of the notes? William Marshall’s deposition, shews his opinion of the value of (hose notes in summer of 1797; when he declared that lie did *92 not possess, nor would he be concerned with one of them; and advised Mr. Marshall not to be concerned with any more: Or, is he injured by being allowed the specie he really paid, as if he had paid that to Morris? It is believed, that the widows and orphans spoken of, and all others, holding Morris’s notes, would be glad to be so paid for them.
In 6 Bac. Abr. 137, Gwil. ed. it is said as in the case of bankruptcy the debt claimed to be set ollj must have existed at the time of the bankruptcy, so, in other cases, it must be in existence at the time of commencing the suit; for which he refers to the 3 T. R. 186, [Evans v. Prosser,] 2 Burr. 1229, [Baskerville v. Brown.] Which is surely very reasonable, it being improper for a debtor after suit, to trump up claims against his creditors in order to discount them, especially when purchased at an under rate.* The counsel aware of this, and that this is the case at law, claims the discount as an equity, and justifies the advantage gained in the purchase, as a balance for the loss in the certificates. Mr. Alexander’s opinion of that loss may justify his morality in the attempt; but the Court having decided that the claim of Morris to the certificates is just, and that the loss, if any, was occasioned by Alexander’s own fault, that loss can give him no equity to extend the value of his. discounts.
Upon the whole, the Court is of opinion that the decrees are all right as far as they go,; but that Morris’s recovery ought to b,e suspended, until he shall release the judgments of Stott & Donaldson, and indemnify Alexander against the outstanding bills, if any, endorsed by him, or allow him credit for their amount: And, with this direction, the decrees are affirmed, with costs.

[* See Shepherd v. Johnson, 2 East, 211; Gray v. The Portland Bank, 3 Mass. R. 364; Merryman v. Criddle, 4 Munf. 543; Shepherd et al. v. Hampton, 3 Wheat. 200.]

[* See Dangerfield v. Rootes, 1 Munf. 529; and act Ass. Feb. 26, 1819, R. C. c. 128, § 87, ed. 1819.]